People ex rel. Michael D. v Toulon (2024 NY Slip Op 05178)

People ex rel. Neville v Toulon

2024 NY Slip Op 05178

Decided on October 22, 2024

Court of Appeals

Singas

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 22, 2024

No. 79 

[*1]The People & c. ex rel. Michael D. Neville, & c., Appellant,
v
Errol D. Toulon, & c., et al., Respondents.

Timothy M. Riselvato, for appellant. 
Kwame N. Akosah, for respondents. 

SINGAS, J.

This appeal requires us to examine whether certain provisions of Mental Hygiene Law § 10.11 (d) (4) satisfy procedural due process. Those provisions govern the procedure for the temporary confinement of sex offenders adjudicated to have "mental abnormalities"—but released from confinement to strict and intensive supervision and treatment (SIST)—pending a final SIST revocation hearing. In particular, section 10.11 (d) (4) permits pre-hearing confinement upon a prompt judicial finding of probable cause to believe that the respondent is a "dangerous sex offender requiring confinement." We conclude that the current statutory scheme appropriately balances the relevant individual and state interests and provides sufficient process to mitigate the risk of erroneous confinement without a respondent's participation at the probable cause stage. Thus, we hold that petitioner has failed to demonstrate that Mental Hygiene Law § 10.11 (d) (4) is unconstitutional on its face, or as applied to him.
I.
In 2007, the legislature passed the Sex Offender Management and Treatment Act (SOMTA) creating a program to closely supervise and treat sex offenders who are near release from prison or parole who possess "mental abnormalities" that create a substantial risk of committing new sex crimes (see L 2007, ch 7). Pursuant to SOMTA, which is codified as article 10 of the Mental Hygiene Law, every "detained sex offender['s]"[FN1] case is reviewed by the Office of Mental Health (OMH), which then refers some offenders to a case review team, which may arrange for psychiatric examination (Mental Hygiene Law § 10.05 [d], [e]). If the case review team determines that the offender is a "sex offender requiring civil management"—meaning they suffer from a "mental abnormality" (id. § 10.03 [q])—the case is referred to the Attorney General for possible litigation (id. § 10.06 [a]). A "mental abnormality" is "a congenital or acquired condition, disease[,] or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes [them] to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" (id. § 10.03 [i]).
If the Attorney General concludes that the offender's case is appropriate for civil management, they may file a petition seeking such management (id. § 10.06 [a]). After additional psychiatric evaluation—and within 30 days of filing the petition—the court must hold a hearing to determine "whether there is probable cause to believe that the respondent is a sex offender requiring civil management" (id. § 10.06 [g]). If the court finds no probable cause, it must dismiss the petition (id. § 10.06 [k]). If probable cause exists, the court must order that the respondent be committed to a treatment facility upon their release from prison or parole and must set a date for trial within 60 days (id. §§ 10.06 [k]; 10.07 [a]). At the trial, the Attorney General bears the burden of proving "by clear and convincing evidence [that] the respondent is a detained sex offender who suffers from a mental abnormality" (id. § 10.07 [a], [d]).[FN2]
If the jury unanimously determines that the Attorney General has sustained their burden, then the court must conduct a separate dispositional hearing to "consider whether the respondent is a dangerous sex offender requiring confinement"—i.e., they "suffer[ ] from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (id. § 10.03 [e])—or a "sex offender requiring [SIST]" (id. § 10.07 [f]; see § 10.03 [r]). If, after the dispositional hearing, the court finds by clear and convincing evidence that an individual meets the criteria in Mental Hygiene Law § 10.03 (e), "then the court shall find the respondent to be a dangerous sex offender requiring confinement," and "the respondent shall be committed to a secure treatment facility for care, treatment, and control until such time as [the respondent] no longer requires confinement" (id. § 10.07 [f]; see also § 10.10).
Article 10 requires at least annual evaluation by a psychiatric examiner to determine whether the respondent is currently a "dangerous sex offender requiring confinement" (id. § 10.09 [b]). Respondents found to be "dangerous sex offenders requiring confinement" also have the right to annually petition the court for discharge, pursuant to which a court must conduct an evidentiary hearing at which the Attorney General bears the burden of proof (id. § 10.09 [a], [d]). Moreover, if OMH determines that a respondent is no longer a "dangerous sex offender requiring civil confinement," it must petition the court for discharge or release to SIST (id. § 10.09 [e]). "The respondent may at any time petition the court for discharge and/or release to the community under a regimen of [SIST]" (id. § 10.09 [f]).
If the court determines that the respondent is not a dangerous sex offender requiring confinement, then the court must release the respondent to SIST. Before release, the Department of Corrections and Community Supervision (DOCCS) recommends supervision requirements that
"may include but need not be limited to, electronic monitoring or [GPS] tracking for an appropriate period of time, polygraph monitoring, specification of residence or type or resident, prohibition of contact with identified past or potential victims, strict and intensive supervision by a parole officer, and any other lawful and necessary conditions that may be imposed by a court" (id. § 10.11 [a] [1]).
The court must then enter an order specifying the respondent's SIST conditions, including supervision requirements and "compliance with a specified course of treatment" (id. § 10.11 [a] [2]).
This appeal concerns the initial step in the process for revoking SIST. "If a parole officer has reasonable cause to believe that" a respondent has violated a SIST condition, or if an "evaluation or report by a treating professional indicat[es] that the person may be a dangerous sex offender requiring confinement," a parole officer may take the violator into custody and transport them to a facility for a psychiatric evaluation, which must take place within five days (id. § 10.11 [d] [1]). Once the violator is taken into custody, DOCCS must "promptly" notify the Attorney General and the Mental Hygiene Legal Service (MHLS), which provides legal representation to article 10 respondents (id.). The Attorney General may then petition for [*2]confinement or a petition to modify the conditions within five days (id. § 10.11 [d] [2]).[FN3] The petition must "be served promptly on the respondent and [MHLS]," and the court must appoint legal counsel to represent the respondent and provide counsel with a copy of the psychiatric evaluation (id. § 10.11 [d] [3]). If the Attorney General files a petition seeking confinement,
"then the court shall promptly review the petition and, based on the allegations in the petition and any accompanying papers, determine whether there is probable cause to believe that the respondent is a dangerous sex offender requiring confinement. Upon the finding of probable cause, the respondent may be retained in a local correctional facility or a secure treatment facility pending the conclusion of the proceeding" (id. § 10.11 [d] [4]).
Within 30 days of the petition seeking confinement, the court must "conduct a hearing to determine whether the respondent is a dangerous sex offender requiring confinement" (id.). At this final revocation hearing—which is conducted in accordance with the same procedures as the initial dispositional hearing—the respondent may offer evidence and present arguments (id. §§ 10.07 [f]; 10.11 [d] [4]). "Any failure to commence the hearing within [30 days] shall not result in the dismissal of the petition and shall not affect the validity of the hearing or the determination" (id. § 10.11 [d] [4]). "The respondent shall not be released pending the completion of the hearing" (id.).
II.
In 2006, Ralph S. was convicted of first-degree sexual abuse and sentenced to a period of incarceration. Prior to his release, in 2010, the Attorney General filed a civil management petition pursuant to Mental Hygiene Law article 10 and, after a trial, a jury found that Ralph S. had a "mental abnormality." After a dispositional hearing, Supreme Court determined that he was a "dangerous sex offender requiring confinement" and ordered him confined. In 2016, Supreme Court determined that Ralph S. no longer required confinement and transferred him to SIST. As conditions of SIST, Ralph S. agreed to, among other things, abstain from using or possessing alcohol, wear an alcohol monitoring bracelet, and not tamper with that bracelet.[FN4]
In December 2019, Ralph S.'s parole officer charged that, on several occasions that month, Ralph S. had tampered with his alcohol monitoring bracelet to conceal his use of alcohol in violation of his SIST conditions. The parole officer deemed the violations concerning given the connection between his alcohol use and his prior sex offenses, and his failure to be forthcoming regarding his use of alcohol/tampering with the alcohol monitoring device. Ralph S. was taken into custody on December 19. Two days later, an OMH psychologist interviewed Ralph S. while he was in custody with his MHLS counsel present. On December 23, the OMH psychologist issued her report concluding that Ralph S. was a dangerous sex offender requiring confinement based on her diagnoses and the circumstances surrounding Ralph S.'s SIST violation. The report indicated that, given Ralph S.'s reported connection between his alcohol use and his sex offenses, including informing treatment providers that if he began drinking again, he would reoffend, the nature of his SIST violation presented a heightened risk of reoffense.
Five days after he was initially detained, on December 24, the Attorney General filed a petition to revoke Ralph S.'s SIST regimen and transfer him to secure confinement. The violation report and the OMH psychologist's evaluation report were attached to the petition. The same day, Supreme Court reviewed the [*3]petition and accompanying documents and determined that there was probable cause to believe that Ralph S. was a "dangerous sex offender requiring confinement." The court therefore ordered Ralph S. detained pending a final SIST-revocation hearing, which it scheduled for January 15, 2020—28 days after he was taken into custody. His attorney subsequently requested and was granted an adjournment until February 26 to have additional time to obtain an expert report.
On January 31—after his counsel had requested the initial adjournment, but before the adjourn date—Ralph S. filed a habeas corpus proceeding against OMH and DOCCS. He argued that Mental Hygiene Law § 10.11 (d) (4) violates procedural due process because it does not provide notice and an opportunity to be heard on the issue of whether there is probable cause to believe that the individual alleged to have violated their SIST conditions is a dangerous sex offender requiring confinement. At oral argument on the habeas petition, his counsel advanced the same argument. After the hearing, Supreme Court denied the petition, and Ralph S. appealed.[FN5]
The Appellate Division converted the proceeding to a declaratory judgment action and declared that the relevant statutory provision did not violate Ralph S.'s right to due process (see 215 AD3d 874 [2d Dept 2023]). Initially, though the appeal was academic because Ralph S. had been released back to the SIST regimen, the Court determined that conversion to a declaratory judgment action was appropriate because the exception to the mootness doctrine applied (id. at 876-877; see People ex rel. Molinaro v Warden, Rikers, Is., 39 NY3d 120, 124 n 2 [2022]).[FN6] The Court rejected Ralph S.'s facial challenge, concluding that in at least some circumstances, the statute sufficiently protects respondents' liberty interests from erroneous deprivation and provides them procedural due process (215 AD3d at 879). The Court also rejected his as-applied challenge, insofar as it was preserved (id. at 880).
Petitioner appealed as of right (see CPLR 5601 [b] [1]).
III.
It is well settled that "[l]egislative enactments are entitled to 'a strong presumption of constitutionality' " (Dalton v Pataki, 5 NY3d 243, 255 [2005], quoting Schulz v State of New York, 84 NY2d 231, 241 [1994]). "Courts strike them down only as a last unavoidable result" (Matter of Van Berkel v Power, 16 NY2d 37, 40 [1965]) after "every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible" (Matter of Fay, 291 NY 198, 207 [1943]). A party advancing a facial challenge "bear[s] the burden to demonstrate that in any degree and in every conceivable application, the law suffers wholesale constitutional impairment" (Cohen v State of New York, 94 NY2d 1, 8 [1999] [internal quotation marks omitted]).
Regarding the statutory scheme at issue here, it is settled that a state may use civil process to confine a sex offender for treatment of a " 'mental abnormality' . . . that makes it difficult, if not impossible, for the person to control [their] dangerous behavior" (Kansas v Hendricks, 521 US 346, 358 [1997]), upon "proof of serious difficulty in controlling behavior" (Kansas v Crane, 534 US 407, 413 [2002]). Due process does not require states to provide supervised release for any sex offender who is found to possess a "mental abnormality" (see Hendricks, 521 US at 358). However, "state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment" (Vitek v [*4]Jones, 445 US 480, 488 [1980]). The state does not challenge petitioner's assertion that release of a sex offender requiring civil management to SIST creates such a liberty interest.
"[T]he Due Process Clauses of the Fifth and Fourteenth Amendments, as expressed by the Mathews v Eldridge (424 US 319, 335 [1976]) balancing test, govern the scope of procedural due process" in civil confinement proceedings (Matter of State of New York v Floyd Y., 22 NY3d 95, 103 [2013]). " 'Due process is flexible and calls for such procedural protections as the particular situation demands' " (Mathews, 424 US at 334, quoting Morrissey v Brewer, 408 US 461, 481 [1972] [brackets omitted]). Thus, courts must consider three factors to determine the dictates of due process in a given context: "(1) the private interest of the litigant; (2) the risk of erroneous deprivation in the absence of substitute procedures; and (3) the State's interest in avoiding additional procedures" (Floyd Y., 22 NY3d at 105). Petitioner contends that an adversarial probable cause hearing, where an individual is allowed to present evidence and make arguments, is necessary to protect the procedural due process rights of those subject to confinement pending final SIST-revocation hearings. We disagree.
A.
"Freedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action' " (Hendricks, 521 US at 358, quoting Foucha v Louisiana, 504 US 81, 80 [1992]; see Floyd Y., 22 NY3d at 105) However, at the point of a SIST revocation proceeding, a jury has already determined after trial that the individual possesses a "mental abnormality." This finding that the respondent has a "condition, disease[,] or disorder" causing them "serious difficulty" in controlling their predisposition toward conduct constituting a sex offense—entails extensive due process safeguards, including requiring a unanimous jury verdict, imposing the heightened standard of proof by clear and convincing evidence, and placing the burden of proof on the Attorney General (Mental Hygiene Law §§ 10.03 [i]; 10.07). Here, our focus is on the limited statutory liberty interest created by the court releasing a respondent to SIST after the jury's unanimous verdict of "mental abnormality."
The relevant consideration is the nature of that interest, and the degree to which confinement upon a showing of probable cause infringes on it. At the outset, by statute, a respondent's release to SIST is expressly subject to revocation upon a determination that the respondent is a "dangerous sex offender requiring confinement." Moreover, the statute does not contemplate indefinite detention based on the initial probable cause finding. The Mental Hygiene Law provides that a SIST-revocation hearing must take place within 30 days of a confinement petition (id. § 10.11 [d] [4]).[FN7] Thus, we conclude that SIST revocation respondents possess a diminished and temporary physical liberty interest implicated by the court's probable cause determination.
[*5]B.
Second, the degree to which an adversarial probable cause proceeding would provide additional protection against erroneous probable cause determinations is minimal. At the outset, the statute's requirement of an independent judicial probable cause finding provides a significant safeguard. To sustain their burden, the Attorney General must present evidence sufficient to support a reasonable belief that the individual has "such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (id. § 10.03 [e]; see § 10.11 [d] [4]). Indeed, courts have held that judicial probable cause determinations provide substantial procedural protection, even absent an opportunity to be heard (compare Gerstein v Pugh, 420 US 103, 120 [1975] [holding that an ex parte judicial hearing on the issue of probable cause for pretrial detention under the Fourth Amendment provides "meaningful protection from unfounded interference with liberty"], with dissenting op at 9 [contending that an independent judicial probable cause determination does not constitute even "minimal pre-deprivation due process"]). Moreover, a respondent plays some role in the determination, insofar as the psychiatric report that forms the basis for the revocation petition must be prepared based on an interview with the respondent, often with counsel present. And the statutory scheme provides for a respondent's participation at a full revocation hearing to be held within 30 days of the petition, allowing the respondent to present evidence and raise arguments at a full hearing on the relevant factual and legal issues, at which the state's burden of proof is considerably higher.[FN8]
Against this backdrop, the level of added protection an adversarial preliminary hearing would provide is slight and case dependent. Probable cause "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief" (Gerstein, 420 US at 121). Courts are well-equipped to engage in a straightforward probable cause analysis without adversarial presentation, and there is no evidence that courts frequently make erroneous probable cause determinations without respondents' participation. Petitioner has not otherwise demonstrated that the current scheme leads to incorrect probable cause findings, or that a respondent's participation would meaningfully reduce the instance of such errors.
Conversely, allowing a respondent's full participation in an initial hearing could undermine the statute's requirement of an expeditious probable cause determination. In the present case, the statutory procedure enabled Supreme Court to make a probable cause determination the very same day the Attorney General filed the SIST revocation petition, ensuring that Ralph S. was afforded court process within five days of his initial detention. Affording respondents an opportunity to collect and present evidence and file papers would inevitably delay such determinations, resulting in a longer period of confinement without the benefit of this initial process.[FN9]
[*6]C.
The final factor—the state's interest in avoiding additional procedures—weighs heavily in the government's favor. The state's interest in protecting the public is significant. Upon a SIST violation and a psychiatric examiner's determination that an individual is a dangerous sex offender requiring confinement, the state has a strong interest in moving expeditiously to ensure that the respondent, who has been shown to be a serious threat to public safety, is removed from situations where they may harm members of the public (see Senate Introducer's Mem in Support, Bill Jacket, L 2007, ch 7 at 19 ["The compelling need is to protect residents of this state from sex criminals whose recidivism is predictable and uncontrollable. . . . There is a small group who, because of a mental abnormality, cannot control their sexually violent behavior even when subject to strict supervision"]). Requiring adversarial proceedings prior to confinement, even after a psychiatric professional has determined that a respondent is a dangerous sex offender requiring confinement, could pose a serious risk to the public. Conversely, as explained above, confining a respondent pending the outcome of preliminary adversarial proceedings would result in longer confinement before any initial process, undermining the State's "interest in knowing early on whether its grounds for pursuing confinement are mistaken or unfounded" (dissenting op at 14).
D.
Balancing the Mathews factors, though SIST revocation proceedings implicate a diminished physical liberty interest, the relatively short period of confinement before a final hearing, the minimal benefit of an adversarial proceeding, and the state's paramount interest in protecting the public lead us to reject petitioner's contention that the court's initial probable cause determination must take place as part of an adversarial proceeding in order to comport with procedural due process. The procedures outlined in article 10 appropriately balance the need to safeguard respondents' due process rights by prioritizing an expeditious probable cause determination with the need to protect the public from those deemed "likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (Mental Hygiene Law § 10.03 [e]). Thus, petitioner has failed to sustain his burden to demonstrate the statute's facial unconstitutionality.[FN10]
IV.
In addition to his facial challenge, petitioner contends that Mental Hygiene Law § 10.11 (d) (4) violated procedural due process as applied to him. His contention that delay beyond the 30-day statutory window contributed to a due-process violation is unpreserved for our review, because it was not raised in his petition or before Supreme Court. His remaining arguments, to the extent preserved, are unavailing.
Accordingly, the order of the Appellate Division should be affirmed, without costs.

RIVERA, J. (dissenting):

Our Federal and State Constitutions impose procedural constraints on government deprivations of life, liberty and property (US Const Amend XIV; NY Const, art I, § 6; see also Goldberg v Kelly, 397 US 254, 262 [1970]). At the core of these safeguards is an individual's right to pre-deprivation notice and an opportunity to be heard to challenge the factual and legal bases of the government's proposed action " 'at a meaningful time and in a meaningful manner' " (Mathews v Eldridge, 424 US 319, 333, quoting Armstrong v Manzo, 380 US 545, 552 [1965]). On its face, Mental Hygiene Law (MHL) § 10.11 (d) (4) violates that constitutional guarantee by authorizing courts to, in all cases, re-confine sex offenders living in the community under "strict and intensive supervision and treatment" (SIST) (see MHL § 10.03 [q]), based on an ex parte finding of probable cause, until the court later holds an adversarial hearing on the State's petition to revoke the offender's community placement.
Under Mathews, the familiar factors to determine what process is due when the State seeks to revoke SIST all weigh in favor of offenders accused of breaching SIST conditions and against the facial validity of the statute. First, each offender has a liberty interest in remaining in the community. Second, the State's unchallenged, one-sided presentation supporting its assertion of probable cause unduly heightens the risk of erroneous confinement. Third, precluding offenders' early participation in the revocation proceeding—while they are already detained—undermines the State's interest in public safety by disrupting offenders' orderly rehabilitation and reentry into the community. By this stage in the proceeding, there has been a judicial determination that the offender is not a "dangerous sex offender requiring confinement" (MHL §§ 10.03 [e], 10.07 [f]) and, indeed, an offender's written submission may assist the court in identifying possible factual errors and legal missteps in the State's arguments. Therefore, MHL 10.11 (d) (4) is unconstitutional on its face.
[*7]I.
In 2016, Supreme Court concluded that petitioner—having previously been convicted of sex offenses and found to have a "mental abnormality" as defined by MHL Article 10—was not a "dangerous sex offender requiring confinement" (id. § 10.07 [f]). The law therefore required the court to order his release to SIST, subject to court-ordered conditions. Petitioner sought termination of his SIST conditions under MHL § 10.11 (f) sometime in fall 2019. In December 2019, before Supreme Court rendered a decision on that request, petitioner was taken into custody based on his parole officer's allegations that he violated certain alcohol-related SIST conditions. Within five days, in accordance with MHL § 10.11 (d) (2), the State filed an ex parte petition to revoke petitioner's SIST. The state alleged that he violated the conditions by consuming alcohol and tampering with an alcohol-detection device and that this, coupled with the results of a psychiatric examination conducted during the five-day interim, established probable cause that he was a dangerous sex offender requiring both revocation of his SIST placement and confinement. After several adjournments and while petitioner was still in custody, Supreme Court held the statutorily-mandated hearing on April 30, 2020. Two weeks later, the court concluded that the State failed to establish grounds to revoke petitioner's SIST placement and ordered him released back to SIST. On June 22, 2020, the State filed a second petition to detain petitioner and the court again ordered that he remain in custody based on probable cause that he consumed alcohol in violation of his SIST conditions. Supreme Court subsequently declined the State's revocation petition and ordered petitioner released back to SIST. In 2023, Supreme Court granted petitioner's request to terminate SIST, finding that petitioner did not suffer from a "mental abnormality" as defined in MHL § 10.03 (i) and thus no longer subject to Article 10.
During the pendency of the State's first revocation petition, petitioner sought a writ of habeas corpus, challenging the constitutionality of MHL § 10.11 (d) (4) on the ground that he was denied notice and an opportunity to be heard on whether there was probable cause to support his confinement pending conclusion of the proceeding. Supreme Court denied the writ and the Appellate Division modified to convert the matter to a declaratory judgment action and, as modified, affirmed (215 AD3d 874 [2d Dept 2023]).
II.
Petitioner mounts both a facial and an as-applied constitutional challenge to MHL § 10.11 (d) (4). Petitioner's as-applied challenge to the duration of his confinement beyond the 30 days provided in section 10.11 (d) (4) is unpreserved because he failed to assert this claim in Supreme Court despite having had an opportunity to do so (see e.g. Mouradian v Astoria Fed. Sav. and Loan, 91 NY2d 124, 131 n 4 [1997]). Petitioner's facial challenge to this same provision is without merit. Contrary to his contention, the text does not authorize indefinite detention. Indeed, petitioner could have—but did not seek—mandamus relief to compel the court's compliance with the statutory deadline (see Matter of Legal Aid Soc. of Sullivan County, Inc. v Scheinman, 53 NY2d 12, 16 [1981] ["Mandamus lies to compel the performance of a purely ministerial act where there is a clear legal right to the relief sought"]).
Petitioner's remaining facial challenge to the statutorily-mandated MHL § 10.11 (d) (4) ex parte process has merit. "Normally, a plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the [law] would be valid, or show that the law lacks a plainly legitimate sweep" in order to prevail (Americans for Prosperity Found. v Bonta, 594 US 595, 615 [2021] [internal quotation marks omitted]). Petitioner has met this standard. As I discuss below, by its terms, MHL § 10.11 (d) (4) establishes an ex parte mechanism for the State to seek extended pre-hearing confinement, and therefore the law uniformly denies all offenders on SIST an opportunity to be heard on the merits in advance of the court's probable cause determination.
[*8]III.
The majority adequately sets out the relevant MHL Article 10 framework and the specific procedures challenged on this appeal. However, it fundamentally misconstrues and misapplies elementary constitutional principles.
A.
Mathews sets forth the legal standard by which to determine what process is due at the initial probable cause stage of the State-initiated SIST revocation proceeding (see majority op at 10-11, citing 424 US at 335). Under Mathews, we balance the following three factors to determine what procedure is due in conjunction with the exercise of governmental power:

 "First, the private interest that will be affected by the official action; 
 second, the risk of an erroneous deprivation of such interest through the 
 procedures used, and the probable value, if any, of additional or substitute 
 procedural safeguards; and finally, the Government's interest, including the 
 function involved and the fiscal and administrative burdens that the 
 additional or substitute procedural requirement would entail" (424 US at 
 335).

 B.
The first factor weighs heavily in petitioner's favor because he has a constitutionally protected interest in his continued liberty on SIST. Although the United States Supreme Court has concluded that a dangerous sex offender may be civilly confined and the government need not provide a community-based alternative (see Kansas v Crane, 534 US 407, 413 [2002]), the New York legislature established such a community-based alternative to civil confinement when it adopted the Sex Offender Management and Treatment Act of 2007 (SOMTA) (see L 2007, ch. 7, § 2). The scheme's two-tiered system requires confinement of dangerous sex offenders and community placement of all others (see MHL § 10.07 [f]). In enacting SOMTA, New York has created for offenders on SIST a constitutionally-protected liberty interest subject to all the protections inherent in that interest (see Wilkinson v Austin, 545 US 209, 221 [2005] [observing that "a liberty interest . . . may arise from an expectation or interest created by state laws or policies"]; Sandin v Conner, 515 US 472, 483-484 [1995] ["States . . . create liberty interests which are protected by the Due Process Clause"]). Under SOMTA, upon a judicial finding that a sex offender has a mental abnormality as defined in MHL § 10.03 (e), the court must determine if the offender is a dangerous sex offender, in which case the court must order civil confinement in a secure treatment facility (MHL § 10.07 [f]). Where the court makes no such finding, it "shall" order a SIST disposition along with applicable conditions (id.). This disposition reflects the legislative finding that, for a person who is not a dangerous sex offender requiring confinement, "it can be effective and appropriate to provide treatment in a regimen of [SIST]"; and ultimately "[t]he goal of a comprehensive system should be to protect the public, reduce recidivism, and ensure offenders have access to proper treatment" (id. § 10.01 [c]).
"[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection" (Addington v Texas, 441 US 418, 425 [1979] [emphasis added]). The majority acknowledges that, for petitioner and other offenders on SIST, this interest is "significant," but then asserts that the interest is "diminished and temporary" or "limited" (majority op at 12). Having thus characterized the interest, the majority next concludes that this supposedly lesser grade of liberty is sufficiently protected by the petitioner's participation in the later, adversarial hearing, even though the petitioner is confined throughout the proceeding. This analysis suffers from several fatal flaws.
First, the majority points to "the initial finding of a 'mental abnormality' " under MHL § 10.03 (i) as a basis for diluting an offender's interest in remaining at liberty while a court determines whether they violated [*9]a SIST condition (see id. at 11-12). That premise is analytically misplaced. A prior "mental abnormality" is a precondition to the court's disposition on the proper placement of such offender: confinement or life in the community on SIST (see MHL § 10.01 [f]). Upon that disposition, offenders placed on SIST, such as petitioner, acquire an interest in their "continued liberty" (Morrissey, 408 US at 482)—in other words, remaining in the community—and, in turn, that is the liberty interest at issue in this appeal (Kansas v Hendricks, 521 US 346, 356 [1997] ["(F)reedom from physical restraint . . . 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action' "], quoting Foucha v Louisiana, 504 US 71, 80 [1992]). Simply put, the prior finding of an offender's "mental abnormality" has no bearing on the gravity of their interest in continued personal liberty.
Second, the majority completely ignores the United States Supreme Court's analysis in Morrissey (408 US at 471). Although Morrissey involved parolees, its reasoning applies with equal—if not greater—force to offenders on SIST. Both classes of individuals have been convicted of a crime and released into the community subject to conditions intended to further rehabilitation and protect the public (see Matter of Silmon v Travis, 95 NY2d 470, 477 [2000] [noting that the Board (of Parole) is empowered to deny parole where it concludes that release is incompatible with the welfare of society" and that "there is a strong rehabilitative component in (parole) that may be given effect by considering remorse and insight"]; MHL § 10.01 [c] ["The goal of (SOMTA) should be to protect the public, reduce recidivism, and ensure offenders have access to proper treatment"]). Both have a reliance interest based on the State's "implicit promise that [their release into the community] will be revoked only if [they] fail[ ] to live up to the [supervisory] conditions" (Morrissey, 408 US at 482). And both have strong interests in their "continued liberty" (id.). Indeed, those interests are effectively indistinguishable from one-another when it comes to "[t]he fundamental requirement of due process[:] . . . the opportunity to be heard" (Mathews, 424 US at 333).
"The liberty of a parolee enables [them] to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that [they] show[ ] reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of [their] parole, [they] can be gainfully employed and [are] free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects [them] to many restrictions not applicable to other citizens, [their] condition is very different from that of confinement in a prison. [They] may have been on parole for a number of years and may be living a relatively normal life at the time [they are] faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if [they] fail[ ] to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if [their] parole is revoked" (Morrissey, 408 US at 472 [footnotes omitted]).
Thus, "[t]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others" (id.). We could easily substitute "offender on SIST" for "parolee" in this analysis and reach the same conclusion.
Most troubling is that the majority's view of petitioner's liberty interest as unworthy of even minimal pre-deprivation due process. That view harkens back to the long-rejected classification of indeterminate liberty as a mere governmental privilege subject to governmental deprivation without protection, as opposed to a constitutional right whose revocation requires heightened procedural safeguards. Again, Morrissey is on point here in that it discarded these labels because "[b]y whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment" (id.).
[*10]C.
The second Mathews factor weighs squarely in the offenders' favor. With respect to this factor, the Court must consider (1) "the risk of an erroneous deprivation" of a SIST offender's freedom from imprisonment "through the procedures used," and (2) "the probable value, if any, of additional or substitute procedural safeguards" (Mathews, 424 US at 335). "The only interest to be considered at this part of the Mathews analysis is that of the detained individuals—not the government" (Black v Decker, 103 F4th 133, 152 [2d Cir 2024], citing Hamdi v Rumsfeld, 542 US 507, 530 [2004]). The risk of needless detention in this context is far from "minimal," as the majority argues (majority op at 12-13). Section 10.11 (d) of the MHL allows only for a one-sided presentation from the State at the initial probable cause stage; offenders are given no opportunity to be heard on whether they will remain imprisoned during the pendency of the proceedings (see MHL §§ [d] [1], [2], [4]). Of course, the State is not a neutral party in these proceedings. Rather, the State acts an advocate bringing to bear all its resources to persuade the court to find probable cause that the offender is a danger and should be confined. This unchallenged argumentation is fundamentally at odds with the principle that the "fundamental instrument for judicial judgment" is "an adversary proceeding in which both parties may participate" (Carroll v President and Commrs. of Princess Anne, 393 US 175, 183 [1968]). The ex parte process mandated by MHL § 10.11 (d) (4), in turn, creates a high risk that the court will find probable cause based on incomplete or even inaccurate information, resulting in a wrongful deprivation of the offender's personal liberty.
The majority unpersuasively attempts to minimize the potential for error. Citing Gerstein v Pugh, it asserts that "judicial probable cause determinations provide substantial procedural protection, even absent an opportunity to be heard" (majority op at 12-13, citing 420 US 103, 120 [1975]). Reliance on Gerstein is misplaced because in New York, a criminal defendant detained pre-trial always "may make an application for recognizance, release under non-monetary conditions, bail, a reduction of bail, or imposition of non-monetary conditions in conjunction with bail or a reduction of bail" (CPL 510.20 [1]). "Upon such application, the principal must be accorded an opportunity to be heard, present evidence and to contend that an order" for bail, release, etc. should issue (CPL 510.20 [2] [b]). Section 10.11 (d) (4), by contrast, extends no such opportunities to offenders detained ex parte pending completion of a SIST revocation proceeding (see MHL § 10.11 [d] [4]).
Second, the majority essentially acknowledges that an offender's participation assists in the judicial decision-making process because the offender may bring factual errors to the court's attention and set forth legal arguments in opposition to the State (see majority op at 13-14). Nevertheless, the majority holds this factor against offenders accused of SIST violations, postulating in oblique and confusing fashion that allowing them an opportunity to be heard on the question of probable cause essentially may delay the court's determination beyond the initial five-day period (see id. at 14). There are glaring problems with this holding. For starters, the majority's apparent worry about denying offenders "initial process" is curious, given that its holding denies offenders a right be heard before the probable-cause determination (id.). The majority also misconstrues the statute's plain text. Under MHL § 10.11, the court must hold the revocation upon the State's filing of its petition for confinement. In other words, the 30-day clock commences with the State's filing, not the court's probable cause determination (see MHL § 10.11 [d] [2], [4]). It is therefore unclear how permitting offenders to be heard on the question of probable cause in written form "would result in a longer period of confinement" in toto even on the majority's speculative assumption that offenders' participation would delay the probable-cause determination beyond five days (see majority op at 14; MHL § 10.11 [d] [2]). The majority's holding thus turns due process on its head. Consider that nothing in MHL § 10.11 (d) prohibits courts from allowing offenders to be heard on probable cause yet, under the majority's view, a court would violate rather than respect an offender's due process rights by extending to them an opportunity to be heard simply because their submission might cause some delay.
Notably, the majority appears to acknowledge that an offender's participation may expose flaws in the State's position and that careful judicial scrutiny may take more time when the State's arguments are [*11]opposed. But careful informed consideration of the issues is the work of the court and precisely what due process requires. Continued confinement during the time it takes the court to resolve the individual's challenge is always a risk the individual must assess before embarking on that challenge and due process of course vests any strategic choice to assume such risk in the individual, not the government. In any event, "[t]he need for expediency cannot overshadow the fact that a critical decision was being made about [petitioner] that determined his potential to commit further sex offenses" (People v David W., 95 NY2d 130, 139 [2000]; see also Wolff v McDonnell, 418 US 539, 589 [1974] [Marshall, J., concurring] [noting that delays "are small costs to bear to achieve significant gains in procedural fairness"]).
The majority adopts a view contrary to general practice. Indeed, pre-hearing ex parte deprivations are not the norm, certainly not where liberty is at stake (e.g. Morrissey, 408 US at 485-486). "Due process requires that a person whose constitutional rights are affected by government actions is entitled to be heard and it makes obvious sense in most cases 'to minimize substantially unfair or mistaken deprivations' by insisting that the hearing be granted at a time when the deprivation can still be prevented" (Lee TT. v Dowling, 87 NY2d 699, 713 [1996], citing Fuentes v Shevin, 407 US 67, 79-82 [1972]).
The State's argument that the risk of error is low because the probable cause standard is minimal and easily met is nothing more than a bald assertion that the State is always right. But, if the State were always right, then there would be no need for an independent judicial determination whether the State has carried its burden both at the probable cause stage and any subsequent consideration of the State's petition for confinement.[FN11]
D.
As for the third factor—the State's interest in a proceeding which denies any opportunity for the offender to be heard before the court's probable cause determination—the majority concludes that this factor should be weighed on the State's side. The majority asserts that because the State has an interest in public safety it must act expeditiously (see majority op at 15). True enough, but the majority ignores an obvious and significant fact: the petitioner has been arrested and is in custody when the State submits its petition and during the pendency of the court's probable cause determination (MHL § 10.11 [d] [4]). The majority fails to explain how an opportunity for the petitioner to be heard in opposition to the State's position on probable cause places the public at risk when, at that point, the petitioner is already confined.
Significantly, the majority narrowly defines the State's interest, failing to acknowledge that the State also has interests in: (1) an offender's effective rehabilitation on SIST, which confinement frustrates; and (2) a timely and accurate determination regarding whether an offender's situation has changed such that they have become a public danger requiring civil confinement. Those interests are furthered by notice and opportunity for the offender to be heard on the probable cause petition. The State has no interest in the erroneous deprivation of an offender's liberty and every interest in knowing early on whether its grounds for pursuing confinement are mistaken or unfounded. Notably, the administrative and fiscal impacts on the State are de minimis: the work falls on the offender to respond to the State's allegations and the court to consider the petitioner's written submission when making its probable cause determination. In other words, "the fiscal and administrative burdens imposed by requiring notice and opportunity to be heard are not prohibitive and are not so significant as to warrant limiting defendant to the procedures the Legislature provided" (David W., 95 NY2d at 139). The Constitution demands more.
Highlighting the majority's radical departure from these bedrock principles of procedural due process is the minimal process required here. Petitioner does not, for example, expressly claim a constitutional right to be present at a full-blown adversarial hearing at the time of the offender's detention by their parole officer [*12]and before the court determines whether to retain an offender's confinement pending final resolution of the State's petition. Contrary to the majority's suggestion, regardless of what petitioner requests, it is for us to determine what due process requires. And, here, due process enshrines the right of an at-liberty offender accused of a SIST violation to, at a minimum, challenge, in writing, the State's position on probable cause within the five-day period during which, if the State chooses to seek confinement, the MHL requires the State to file such petition (see MHL § 10.11 [d] [2]).[FN12]
Since all of the Mathews factors support petitioner, and MHL § 10.11 (d) (4) unambiguously codifies an ex parte probable cause mechanism that uniformly denies offenders accused of SIST violations a right to be heard, this an easy case. Just as the Morrissey Court concluded that parolees are entitled to notice and an opportunity to be heard close to the time of their arrest for a parole violation (see 408 US at 485-486), the same should be true for offenders on SIST. Due process encompasses each offender's right to challenge the State and argue against a probable cause finding (see MHL § 10.11 [d] [2]).
IV.
The facts and procedural history of petitioner's case undermine the majority's analysis at every step. Petitioner was released to SIST only after a judicial determination that he was not a dangerous sex offender requiring confinement but rather the type of offender for whom it was "effective and appropriate to provide treatment in a regimen of [SIST]" (MHL § 10.01 [c]). Following two revocation petitions, during which petitioner was in custody for months each time, the court twice concluded that the State failed to establish that he should be confined. Both times before coming to that same conclusion, however, the same court found—based on the State's ex parte submission—that there was probable cause to believe that petitioner should be confined. Only following adversarial hearings during which petitioner could contest the State's arguments and present his own evidence did the court deem confinement inappropriate. We will never know if a submission by petitioner would have led the court to hold that there was no probable cause to revoke SIST. But due process forbids such uncertainty when personal liberty is at stake and these minimal safeguards would avoid erroneous deprivations of liberty without any negative impact on public safety.
Order affirmed, without costs. Opinion by Judge Singas. Judges Garcia, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion, in which Chief Judge Wilson concurs.
Decided October 22, 2024

Footnotes

Footnote 1: This includes any person who is in "care, custody, control, or supervision" with respect to a "sex offense" or "designated felony" (Mental Hygiene Law § 10.03 [g]; see also § 10.03 [p] [defining "sex offense"]).

Footnote 2: The respondent may also waive a jury trial (Mental Hygiene Law § 10.07 [b]).

Footnote 3: If the Attorney General fails to file a petition within this time period, the respondent must be released back to SIST, "but failure to file a petition within such time shall not affect the validity of such petition or any subsequent action" (Mental Hygiene Law § 10.11 [d] [2]).

Footnote 4: Before his release, Ralph S. signed a statement affirming that he had reviewed his SIST conditions with the assistance of counsel and agreed to comply.
Footnote 5: Ralph S. ultimately submitted his independent psychiatric evaluation on March 13. On March 17, the District Administrative Judge for Suffolk County issued an administrative order adjourning all nonessential matters until on or after April 30, 2020, in response to the COVID-19 pandemic. Ralph S.'s SIST revocation hearing was adjourned to, and held on, that date, in conjunction with a hearing on an application by Ralph S. to be released from civil management. After the hearing, the court denied both applications and ordered Ralph S. to return to SIST.

Footnote 6: On March 29, 2023, Supreme Court discharged Ralph S. from civil management based on an OMH psychologist's subsequent opinion that Ralph S. no longer had a condition that meets the statutory definition of a mental abnormality.

Footnote 7: Petitioner also argues that the lack of any enforcement mechanism in the statute for the 30-day requirement violates procedural due process on its face. This does not implicate the provision's facial constitutionality because the mere possibility of extended delays in some cases does not demonstrate that the statute is unconstitutional in every application, as is necessary for petitioner's facial challenge to succeed. Thus, this consideration is more appropriately addressed in the context of an as-applied challenge.

Footnote 8: A respondent may also raise such issues pursuant to their right to petition the court for discharge at any time (see Mental Hygiene Law § 10.09 [f]).

Footnote 9: The dissent admittedly ignores petitioner's arguments as to the process required, instead creating its own rule allowing respondents to file papers, but only within the five-day period the Attorney General has to file a SIST revocation petition (compare dissenting op at 15 [ "due process enshrines the right of an at-liberty offender accused of a SIST violation to challenge, in writing, the State's position on probable cause within the five-day period during which, if the State chooses to seek confinement, the MHL requires the State to file such petition"], with reply brief for petitioner at 2 ["balancing of interests clearly militates in favor of providing basic due process protections at a preliminary probable cause hearing"], 19 n 10 ["Unlike the State, respondents do not already have psychological reports prepared. That such time crunches are possible only emphasizes the need for an initial preliminary hearing"], 30 ["A preliminary hearing is needed to assure that the finding of a violation will be based on verified facts and informed by an accurate knowledge of the behavior" (internal quotation marks and ellipses omitted)]; oral argument tr at 8 ["Someone who's on parole and they are alleged to have violated parole, they get a preliminary hearing on the need for pre-hearing detention . . . . At that hearing, they get to present evidence. They get to confront witnesses. That's exactly the situation that we would ask for here"]). The more limited procedure concocted by the dissent faces the glaring issue of the right being dependent on how long it takes for the Attorney General to file their petition. Indeed, the revocation petition in this case was filed exactly five days after Ralph S. was initially detained.

Footnote 10: To the extent petitioner urges us to treat initial SIST revocation proceedings like preliminary parole revocation proceedings at which parolees have a limited right to appear, provide evidence, and question witnesses relevant to a probable cause determination (see Morrissey, 408 US at 487), we note that SIST revocation proceedings bear important differences—including a prior jury finding of "mental abnormality" and heightened public safety concerns—that counsel against a mechanical application of this parole-revocation precedent in the present case. While the dissent accuses us of "ignor[ing]" Morrissey (dissenting op at 8), it clearly also recognizes that there are distinctions, given that it declines to grant SIST revocation respondents the same procedural safeguards in preliminary hearings (see dissenting op at 14-15).

Footnote 11: Indeed, as this very case and others demonstrate, the State sometimes fails to meet its ultimate burden of showing by clear and convincing evidence that the offender is "unable to govern [their] sexual conduct" (Matter of State of New York v Michael M., 24 NY3d 649 [2014]; e.g. Matter of State of New York v George N., 160 AD3d 28, 33-34 [4th Dept 2018]).

Footnote 12: The majority's criticism of my analysis as one that "ignores petitioner's arguments as to the process required" and for "creating its own rule" (majority op at 14 n 9) is mistaken. The majority overreads petitioner's position, which does not necessarily require "full participation in an initial hearing" (id. at 14). More fundamentally, the majority forgets that appellate courts have a responsibility to define the parameters of what due process requires notwithstanding a party's overbroad interpretation of the law. In concluding that due process here compels at least a "more limited procedure" than what petitioner might prefer—written submissions versus a full in-person hearing—I have not "concocted" a rule, but have faithfully applied the Due Process Clause—"an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake" (Lassiter v Department of Social Services of Durham County, N. C., 452 US 18, 24-25 [1981]).